```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                        CASE NO. 21-MJ-06598-AOV
 3
      UNITED STATES OF AMERICA,
 4                                        Fort Lauderdale, Florida
                      Plaintiff(s),
 5                                        November 5, 2021
              vs.
 6
      ELIANDE TUNIS,
 7
                      Defendant(s).       Pages 1 - 71
 8    ----------------------------------------------------------

 9                          DETENTION HEARING
                   TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10                  BEFORE THE HONORABLE ALICIA O. VALLE
                       UNITED STATES MAGISTRATE JUDGE
11
      APPEARANCES:
12
      FOR THE PLAINTIFF(S):  CATHERINE KOONTZ, ESQ.
13                           UNITED STATES ATTORNEY'S OFFICE
                             500 East Broward Boulevard
14                           Fort Lauderdale, FL 33394
                             954-660-5940
15                           catherine.koontz@usdoj.gov

16

17    FOR THE DEFENDANT(S):  MARK R. EIGLARSH, ESQ.
                             MARK EIGLARSH LAW OFFICE
18                           4770 Biscayne Boulevard
                             Miami, FL 33137
19                           305-674-0003
                             mark@eiglarshlaw.com
20

21    TRANSCRIBED BY:        Joanne Mancari, RPR, CRR, CSR
                             Court Reporter
22                           jemancari@gmail.com

23

24

25
```

1    Thereupon,

2    the following proceedings were held via Zoom videoconference:

3           THE DEPUTY CLERK:  United States v. Eliande Tunis,

4    case No. 21 6598.

5           Counsels, please announce your appearances for the

6    record, beginning with the government.

7           MS. KOONTZ:  Good afternoon, your Honor.  Catherine

8    Koontz, standing in for Karen Seifert of the District of

9    Columbia, on behalf of the United States.

10          MR. EIGLARSH:  Good afternoon, your Honor.  Mark

11   Eiglarsh on behalf of Ms. Tunis, who is present.

12          THE COURT:  Thank you very much, both of you, for

13   being here.

14          Ms. Tunis, good afternoon, ma'am.  I just want to

15   confirm that that is you in the cellblock, correct?

16          THE DEFENDANT:  Yes.  Yes, ma'am.

17          THE COURT:  Thank you.  I just want to make sure that

18   we have the right person in there.  Also, Ms. Tunis, I want to

19   confirm that I have your consent to continue to hold this

20   hearing by video.  Any objection?

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  I'm sorry.  Do you object or do you agree

23   that we continue by video?

24          THE DEFENDANT:  I agree.  I'm sorry.

25          THE COURT:  OK.  It was the way I asked the question.

```
 1              Any objection from you, Mr. Eiglarsh?

 2         MR. EIGLARSH:  No, your Honor.  Thank you.

 3         THE COURT:  Thank you.

 4         Government.

 5         MS. KOONTZ:  No, your Honor.

 6         THE COURT:  Thank you.

 7         Ms. Tunis, as we continue with this hearing by video,

 8    if at any point there is any kind of malfunction, you can't see

 9    us, hear us, please let us know so that we can fix the problem.

10    OK?

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  All right.  Now, here we are set for a

13    detention hearing and identity hearing.  Are we ready to

14    proceed on that or have the parties agreed to any kind of

15    stipulated arrangement?

16         Ms. Koontz.

17         MS. KOONTZ:  We are ready to proceed, your Honor.

18         THE COURT:  All right.

19         MR. EIGLARSH:  We are ready as well, your Honor.

20         THE COURT:  All right.  Thank you.

21         How are you proceeding, Ms. Koontz?

22         MS. KOONTZ:  Your Honor, I am going to proceed by

23    proffer, and I am asking for pretrial detention based on both

24    danger to the community and risk of flight, your Honor.

25              I do believe that a presumption does apply in this
```

1    case pursuant to 18 U.S.C. 3142(f)(1)(E), which states that if

2    an offense involves the potential for use of a firearm or

3    destructive device.  Because this deals with exporting firearms

4    and the conspiracy to export firearms and smuggling firearms,

5    your Honor, the government would argue that there is a

6    presumption of detention in this case.

7            If it is OK with your Honor, I will go ahead and

8    proceed by proffer.  I have special agent Joseph Kenny

9    available on Zoom for cross-examination.

10           THE COURT:  And who is Joseph Kenny with, agent Kenny

11   with?

12           MS. KOONTZ:  FBI, your Honor.

13           THE COURT:  All right.  Thank you.

14           You may proceed.

15           MS. KOONTZ:  OK.  Thank you, your Honor.

16           A little background on the --

17           THE COURT:  I am going to ask you not to go too fast

18   because I am going to try to take notes as you speak.  So don't

19   go too fast.

20           MS. KOONTZ:  OK.  So background on the 400 Mawozo and

21   Haitian kidnappings.

22           400 Mawozo is a Haitian gang and criminal organization

23   that operated in an area to the east of Port-au-Prince, Haiti.

24           On or about October the 16th of this year, 2021, at

25   approximately 1 p.m. Eastern Standard Time, 16 United States

1  citizens were kidnapped near Port-au-Prince, Haiti, including

2  five children, one as young as eight months old.  The victims

3  were part of a missionary organization and had been taking a

4  bus to visit a local orphanage.  While returning therefrom, the

5  kidnappers forced at gunpoint the group's bus driver to stop

6  and they took control of the bus and its occupants.

7  On or about October the 16th of this year, a

8  representative of the missionary organization received a phone

9  call from an individual claiming to be the leader of the

10  kidnappers.  The individual stated that he had the victims and

11  was holding them for ransom of $1 million each.  The individual

12  told the representative that he would be in touch regarding the

13  next steps.

14  On or about October 18, 2021, Haitian social media

15  began to share a reporting that a specific gang, known locally

16  as 400 Mawozo, had taken credit for the kidnapping and was

17  making publicly known the ransom demand.

18  On or about October the 22nd of 2021, a Facebook video

19  post showed Individual 2 at a local funeral for killed gang

20  members stating that he intended to kill the Americans if he

21  did not receive his money.

22  As of the date that this affidavit was submitted, the

23  hostage takers have had several ransom calls with a

24  representative of the missionary organization.  The hostage

25  takers have not released any of the victims.

1          Coconspirator 1 is a Haitian national and a member of

2     the 400 Mawozo.  Coconspirator 1 is incarcerated but still

3     serves as a leader of the organization in Haiti and directs

4     operations from prison using an unmonitored cell phone.

5          Individual 2 is a Haitian national and a member of 400

6     Mawozo.  Individual 2 serves as a leader of the organization in

7     Haiti.  Individual 2 has appeared on videos posted on social

8     media, stated his name, and has declared himself as a leader of

9     400 Mawozo, including videos posted on social media sites

10    YouTube and Facebook on or about October 22, 2021.

11         Individual 2 has given a video recorded statement to

12    the Haitian press in which he claimed to be the leader of the

13    400 Mawozo, including in videos posted by press organizations

14    on or about April 13, 202 and September 6, 2021.

15         Tunis is a U.S. citizen who was born in Haiti.  She

16    resides in Florida and is a member of 400 Mawozo.  As described

17    further herein, Tunis and her coconspirators obtained weapons

18    and ammunition in the United States and sent the same to 400

19    Mawozo members in Haiti.

20         In order to achieve the scheme, among other things,

21    Tunis used straw purchasers and falsified ATF paperwork and

22    smuggled and concealed the weapons and ammunition in shipping

23    containers.  Tunis has pledged her allegiance to 400 Mawozo on

24    prior occasions, including as follows:

25         On or about October 19, 2021, Tunis texted

1  Coconspirator 1 on What's App -- this was done in Creole --

2  "don't worry about it, stay calm.  You know we are 400 Mawozo.

3  We are strong.  Keep a cool head."

4       Also, on or about October 19, 2021, Tunis sent an

5  audio file to Coconspirator 1 on What's App.  Once again in

6  Creole.  "We are snakes.  We slither to get where we are going.

7  They would be shocked to see Mawozo invade Miami."

8       These conversations demonstrate Tunis' leadership in

9  the gang because she directly communicates with its leader,

10  Coconspirator 1.  Additionally, Tunis' statement that "they

11  would be shocked to see Mawozo invade Miami" confirmed Tunis'

12  covert affiliation with the gang in South Florida.

13       Dor is a Haitian citizen who resides in Florida.  Dor

14  holds a Florida concealed carry permit, and the five-day

15  waiting period to possess a firearm is inapplicable to Dor.

16       St. Louis is a Haitian citizen who resides in Florida.

17  St. Louis holds a Florida concealed weapons permit, and the

18  five-day waiting period to possess a firearm is inapplicable to

19  St. Louis.

20       The Conspiracy.

21       Beginning at least on or about September 24, 2021, and

22  continuing until present, Tunis, Coconspirator 1, Dor, St.

23  Louis, and others known and unknown, in an offense begun and

24  committed in Haiti, and continued within the District of

25  Columbia and elsewhere, knowingly combined, conspired,

confederated, and agreed together and with each other to commit a crime against the United States and its agency, Department of Commerce, to wit, to export and cause the exportation of goods from the United States to Haiti without having first obtained the required licenses from the Bureau of Industry and Security located in the District of Columbia.  That is in violation of 50 U.S.C., United States Code, Section 4819, also known as ECRA.

It was part and a goal of the conspiracy to acquire U.S.-origin goods, specifically firearms and ammunition, from the United States to supply to members of the 400 Mawozo gang in Haiti; to conceal from the United States licensed firearm dealers and, in turn from the United States government and its agency, ATF, that the United States-origin goods were destined for Haiti so as to avoid penalties and disruption of the illegal activity; to frustrate the laws and regulations of the United States; and to evade the prohibitions and licensing requirements of ECRA.  The conspiracy was effected in the following manner, among other things.

According to call data records, Tunis, using a cell phone number with the number ending in 3447, regularly contacted law enforcement -- regularly contacted, law enforcement believes, phone numbers used by Coconspirator 1 ending in 5752 and Individual 2 ending in 3589.

From on or about August the 1st 2021, until on or

1    about October 21st, 2021, the telephone number of Tunis had

2    contact with Coconspirator 1 on 88 occasions, and 20 of those

3    calls have occurred between October 16th and the 21st of 2021.

4         From on or about August 1, 2021, until on or about

5    October 11, 2021, the telephone number of Tunis had contact

6    with Individual 2 on 261 occasions.  In that time period, Tunis

7    and Coconspirator 1 spoke on 62 out of 71 days.  During the

8    same time period, Tunis had contact with Coconspirator 1 and

9    Individual 2 on several occasions, where the calls overlapped

10   and, thus, law enforcement deducts that these were three-way

11   calls, as follows:

12        On September the 12th, 2021, at around 21:42,

13   Individual 2 has a calling number and called Coconspirator 1.

14   That call lasted 30 minutes and 58 seconds.

15        On September the 12th of this year, 2021, at 21:53,

16   Tunis has a calling number, called Coconspirator 1, and that

17   call lasted 19 minutes and 2 seconds.

18        On October the 19th of 2021, the time 16:54:01,

19   Coconspirator 1 called Individual 2, and that call lasted 8

20   minutes and 12 seconds.

21        On October 19, 2021, at 16:57, Tunis called the

22   Coconspirator 1, and that call lasted 11 minutes and 43

23   seconds.

24        On October 21, 2021, at 7:17, Coconspirator 1 called

25   Individual 2, and that call lasted 20 minutes and 20 seconds.

1    On October 21, 2021, at 7:21, Tunis called

2    Coconspirator 1, and that call lasted 4 minutes and 2 seconds.

3    According to messages found on Tunis' phone, in

4    combination with call data records, Tunis obtained

5    specifications for weapons and ammunition that Coconspirator 1

6    wanted to be sent to Haiti for use of the 400 Mawozo.

7    According to messages found on Tunis' phone, in

8    combination with call records, Tunis purchased, or instructed

9    Dor and St. Louis to purchase, weapons and ammunition for the

10   gang.  For instance, on or about October 5th of 2021, Tunis and

11   Dor exchanged a series of What's App text and audio messages

12   while Dor was shopping for firearms and ammunition in a gun

13   store in Orlando, Florida.  During these conversations Tunis

14   frequently coached Dor about what firearms to purchase.  Dor

15   became concerned because the gun store clerk suspected he was

16   buying firearms for another person and told Tunis to stop

17   calling him.

18   Similarly, on or about October 6, 2021, Tunis

19   forwarded St. Louis an audio message via What's App, in which

20   Coconspirator 1 was admonishing St. Louis for his failure to

21   follow Coconspirator 1's instructions to purchase firearms and

22   was praising Dor for quickly following similar orders.  Upon

23   hearing the message, St. Louis responded, "I'm not going to

24   pick the stuff" meaning firearms "with that tone.  But don't

25   worry.  I'll fix it."

1    As described further herein, Tunis, Dor and St. Louis

2    filled out false ATF forms stating that they were the actual

3    buyers of the firearms and that they were not buying the

4    firearms for another person, when in fact they intended to ship

5    and did ship the firearms to Haiti for use by the 400 Mawozo.

6    Tunis, Dor and St. Louis, shipped, caused the firearms

7    to be shipped, or attempted the same, to Haiti, in part by

8    smuggling the weapons.  Specifically, the weapons were wrapped

9    in various packaging, stored in barrel drums, and covered with

10   various household items to disguise the shipment.

11   In order to fund this conspiracy, Tunis fraudulently

12   obtained money orders from Victim 1, an elderly individual for

13   whom Tunis worked and cared, and caused the same to be wired to

14   Tunis' bank account.

15   Exported items subject to the Commerce Control List.

16   Tunis, Dor and St. Louis purchased and attempted to

17   purchase U.S.-origin goods, including firearms and ammunition,

18   from several companies, for export to Haiti and for use of 400

19   Mawozo Coconspirator 1, Individual 2, and others known and

20   unknown, including the items listed below.

21   As relevant here, all of the items listed below have

22   been classified by the Bureau of Industry and Security, BIS,

23   under ECCN, which is a control number, and are subject to the

24   Export Administration Regulations.  Items under this Export

25   Control Classification Number are controlled for national

1   security, regional stability, and firearm convention reasons.

2          According to a Bureau of Industry and Security senior

3   licensing officer, export of these weapons from the United

4   States to Haiti requires an export license issued by the Bureau

5   of Industry and Security.  A search of BIS licensing

6   information using the names of the individuals involved in

7   these transactions failed to identify any valid export license

8   for these transactions.

9          A.  Springfield Armory MIA rifle.

10         On or about September 27, 2021, Dor sent Tunis two

11  screenshots of weapons from a sporting goods store website

12  depicting a Springfield MIA National Match Rifle, W12

13  Springfield MIA SOCCO M16-inch Close Quarter Battle Rifle, and

14  a Springfield Armory MIA Scout Squad Rifle.  On or about

15  October the 4th, 2021, Tunis sent Coconspirator 1 a text

16  message saying, "I got the bullets," and then sent

17  Coconspirator 1 a photograph of a Springfield MIA.

18         According to firearm store and ATF records, on or

19  about October 6, 2021, Dor purchased a Springfield Armory rifle

20  for $2,555.99 from a licensed firearms dealer in Florida.

21         B.  Barrett .50 caliber rifle.

22         On or about October the 4, 2021, Dor sent Tunis a

23  video, apparently taken at a firearms dealer, showing a Barrett

24  82A1 .50 caliber rifle, which law enforcement knows from

25  publicly-available information that such rifles typically cost

1    between 10 and 15,000 dollars.  In the video, Dor zoomed in to

2    show Tunis multiple parts of the firearm and the respective .50

3    caliber ammunition in the display case.

4            According to phone records for a phone number believed

5    to be associated with Coconspirator 1 and the phone number used

6    by Tunis, on or about October the 4th, 2021, Coconspirator 1

7    and Tunis had an 86-minute phone call.  Approximately one

8    minute after the phone call began, Coconspirator 1 placed a

9    call to Dor that lasted approximately 46 minutes.  The timing

10   of the calls likely indicates that there was a three-way call

11   between Coconspirator 1, Dor and Tunis.  Also, on or about

12   October the 4th of 2021, Tunis deposited a $30,000 check into

13   her TD Bank account that ended in 9870.

14           On or about October the 5th of 2021, Tunis conducted a

15   series of financial transactions that resulted in a wire

16   transfer of $15,000 to an account at a Fifth Third Bank account

17   number ending in 6301, which law enforcement believes to be

18   associated with Dor based on records from the payment app

19   Zelle.  Also, on or about October the 5th, 2021, Tunis sent Dor

20   a What's App message with a receipt of the wire transfer.

21   Also, on or about October the 5th, 2021, Dor sent Tunis an

22   audio message acknowledging receipt of the money transfer.

23           According to firearm store and ATF records, on or

24   about October the 6th, Dor purchased a Barrett rifle for

25   $11,079.99, from a licensed firearms dealer in Florida.

1          Also on or about October the 6th, 2021, Tunis sent Dor

2  an audio message, in Creole, to discuss the specialized

3  ammunition used for the Barrett rifle.

4          The audio message is as follows:

5          "Tunis:  What's going on?  I'm anxious.  My heart is

6  beating fast.

7          "Dor:  For the small one, the type of ammo it takes is

8  the 308.  I don't know if you want some of that.  For the

9  powerful one, they won't sell me ammo because they haven't

10  tested it.  I want those bullets.  When you shoot, they're like

11  bombs.  They make so much damage.  It's so powerful it catches

12  fire like a bomb.  I'm going to try to convince him to sell

13  them to me.  If he will sell them to me, he told me to buy ten,

14  but I would only buy five."

15          It is believed by law enforcement that when Dor uses

16  the term "308," he is likely referring to the caliber of rifle.

17  Law enforcement believes that when Dor used the term "powerful

18  one," he was likely referring to the ammunition used for a .50

19  caliber rifle, in this case a Barrett rifle, as compared to a

20  smaller caliber, which is a .308 caliber.

21          Based on the context of this conversation in its

22  entirety of the conspiracy, law enforcement assesses that when

23  Dor states "if he will sell me them," he is referring to the

24  store clerk, and when Dor stated "he told me to buy ten," he's

25  likely referring to Coconspirator 1.

1          Other texts and voice messages obtained in the course

2     of the investigation show that Coconspirator 1 often placed

3     orders regarding various weapons and ammunition.

4          According to location information for Tunis' cell

5     phone, on or about October the 7th, 2021, Tunis' phone was

6     located at longitude and latitude coordinates that correspond

7     to the known location for Dor's residence in Orlando, Florida.

8     Later that day Tunis' phone was located at longitude/latitude

9     coordinates corresponding with Boca Raton, Florida.  Law

10    enforcement believes that the above movement is consistent with

11    Tunis obtaining the firearm from Dor and returning to South

12    Florida with it.

13          C.  Two Century Arms rifles and a Palmetto Arms

14    pistol.

15          On or about October the 6, 2021, Tunis sent a message

16    to St. Louis, directing St. Louis to purchase two AK-47s, one

17    AR-15 firearm from Patrick, last name unknown, who law

18    enforcement believes to be associated with a pawn shop in

19    Miami, Florida.

20          Also, on October 6, 2021, approximately five hours

21    after the above text message was sent, St. Louis sent to Tunis

22    four pictures of firearms from what appears to be inside the

23    aforementioned pawn shop, a licensed firearm dealer, based on

24    law enforcement review of open source information about that

25    shop.

1    According to receipts from the pawn shop and ATF

2    records, so on October the 6th, 2021, St. Louis purchased the

3    following weapons:  A Century Arms 7.62 caliber for $1,074; a

4    Century Arms WASR-10 7.62 caliber for $841; and Palmetto Arms

5    PA-15 caliber, $747.66.

6    On or about October the 10th, 2021, St. Louis sent to

7    Tunis a photograph of a single receipt from the pawn shop in

8    the amount of $2,855.

9    On or about October the 11th, 2021, Tunis sent St.

10   Louis a photograph of a Western Union receipt from Haiti

11   showing that $2,500 was wired to St. Louis' account.

12   On or about October the 11th, 2021, approximately 55

13   minutes after the transmission of the photograph message

14   referred to in the above statement, St. Louis sent an audio

15   message to Tunis stating, "I sent two barrels and I have other

16   firearms inside of it.  They sent the barrels for $400.  The

17   barrel went to Laboule 16."  Based on law enforcement's

18   knowledge of the investigation, Laboule 16 refers to a location

19   south of Port-au-Prince.

20   D.  Ruger pistol.

21   On or about October the 10th, 2021, Tunis sent a

22   picture of a Ruger pistol to Coconspirator 1.  Thereafter, also

23   on or about October 10, 2021, Coconspirator 1 and Tunis

24   exchanged the following What's App audio and text messages in

25   Creole:

1          "Coconspirator 1:  Is it on the butt of the firearm or

2     the butt of the bullet?  I got the firearm, but I need the

3     bullets.  I saw the firearm on a local media platform.  If you

4     have the firearm, then I need to have the bullets for the

5     firearm.  Please send me the video."

6          Tunis replies:  "On the butt of the bullet, baby."

7          Coconspirator 1, responding now via text message:

8     "5.7X28 Ruger 57 Prescott Arizona USA Ruger 57."

9          Also, on or about October the 10th, 2021, Tunis had

10    the following text and audio file exchange via What's App with

11    Individual 3, a contact in her phone and an owner of a security

12    company.  Individual 3 is a Haitian-born, legal permanent

13    resident of the United States.

14         Tunis sent the picture of the Ruger pistol to

15    Individual 3.  In response, Tunis and Individual 3 exchanged

16    text messages in which Tunis requested Individual 3 purchase

17    the Ruger and ammunition for the handgun.

18         Individual 3 responded via audio message, in Creole,

19    to Tunis saying:  "Are you crazy?"  Individual 3 then sent a

20    text message in English to Tunis stating:  "Sorry to inform

21    you, due to my reputation and past deportation stories, I won't

22    be able to help you with anything you're demanding.  Once

23    again, my apologies on that, but do not tell him because my

24    life might in dangerous."

25         Tunis replied by text message via What's App stating,

1    "no problem," and that she would receive the money to make the

2    purchase instead.

3          Individual 3 replied by text message via What's App,

4    expressing concern that the DCPJ, which is the Directorate of

5    the Judicial Police in Haiti, "talk a lot."

6          Tunis replied by text messages, in Creole, via What's

7    App, telling Individual 3 to relax because she would take care

8    of it.

9          According to ATF records, on or about October the 14th

10   of 2021, Tunis purchased a Ruger 5.7 at a pawn shop and gun

11   store in Pompano, Florida, for an unknown amount.

12         Also, on October the 14th of 2021, Tunis sent

13   Coconspirator 1 a text message via What's App stating that "the

14   other gun will come Tuesday."  Tunis further explained by text

15   message that the gun was like the one that Coconspirator 1 had

16   previously acquired in Haiti like the one that was in the

17   picture Coconspirator 1 had previously sent to Tunis.

18         Tunis sent an audio message, in Creole, via What's App

19   in which she explained to Coconspirator 1 that the gun has the

20   pointy bullets, and in Creole, "it's the Ruger too."

21         Knowledge of exportation requirements.

22         There is probable cause to believe that Tunis, Dor and

23   St. Louis all knew that a license or permission was required to

24   ship the firearms that they were purchasing to Haiti.  ATF

25   requires that Form 4473, firearms transaction record, must be

1    filled out as a condition of sale.  Form 4473 states in part:

2    Warning, the information you provide will be used to determine

3    whether you are prohibited by federal or state law from

4    receiving a firearm.  Certain violations of the Gun Control

5    Act, 18 U.S.C. 921, are punishable by up to ten years'

6    imprisonment and/or up to a $250,000 fine.  Any person who

7    exports a firearm without a proper authorization from either

8    the Department of Commerce or the Department of State, as

9    applicable, is subject to a fine of not more than $1 million

10   and up to 20 years' imprisonment.

11           On or about the following dates, Tunis, Dor and St.

12   Louis filled out Form 4473 in order to purchase firearms with

13   the aforementioned language, and thus were aware that the

14   firearms may not be exported without proper authorization from

15   the U.S. government.  This occurred on March 23rd of 2020 by

16   Tunis in Pompano Beach, Florida; this occurred on December 15,

17   2020 by Tunis, Pompano Beach, Florida; this occurred on March

18   the 13th, 2021 by St. Louis, Miami, Florida, and again on March

19   the 13th, 2021 by Tunis in Miami, Florida, and on April 17,

20   2021, by Tunis, Miami, Florida, and on September 21, 2021, by

21   St. Louis, Miami, Florida; on October 1, 2021 by Dor in

22   Orlando, Florida; on October 6, 2021, by Dor in Orlando,

23   Florida; October 6, 2021 by St. Louis, in Miami, Florida; and

24   on October 11, 2021 by Tunis in Pompano Beach, Florida; on

25   October 14, 2021 by Tunis in Pompano Beach, Florida.

1        Additionally, Form 4473 asks in question 21(a):  Are

2   you the actual transferee/buyer of the firearm listed on this

3   form and any continuation sheet (ATF Form 5300.9A)?  Warning:

4   If you are not the actual transferee/buyer, if you are

5   acquiring the firearm on behalf of another person, if you are

6   not the actual buyer, the transferee/buyer cannot transfer the

7   firearm to you.

8        Also, on or about the dates listed above, Tunis, Dor

9   and St. Louis answered yes to questions 21(a), and thus

10  knowingly submitted false information to a licensed firearm

11  dealer and ATF.

12        Evidence of exportation and smuggling.

13        There is probable cause to believe that the

14  coconspirators engaged in exporting firearms to Haiti by means

15  of smuggling on or about at least October 9th, October 11th,

16  October 19, 2021, or attempting to do the same.

17        A.   October 9, 2021 shipment.

18        On or about October the 5th, 2021, Dor sent Tunis an

19  audio message via What's App in which Dor stated how a

20  particular rifle can be broken down for shipment.

21        On or about October the 9th, 2021, Tunis prepared and

22  sent a shipment of firearms to Haiti.  Based on law

23  enforcement's review of the photographs from Tunis' phone,

24  Tunis wrapped the firearms in garbage bags, loaded them into

25  large multi-gallon drums/barrels, covered the firearms with

1    various products, such as clothing, shoes and Gatorade.

2            Relevant to the shipment, Tunis took the following

3    photographs of the shipment on or about October the 9th, 2021:

4            2:17 p.m., a blue barrel with firearms inside wrapped

5    in garbage bags.

6            At 3:09 p.m., a blue barrel with blue and pink

7    backpack inside, with Tunis' hand pointing to where the firearm

8    is hidden.

9            3:20 p.m., a blue barrel with sheets covering the

10   contents.

11           At 3:34 p.m., two blue barrels covered with lids.

12           At 4:14 p.m., blue barrel with firearms inside wrapped

13   in garbage bags.

14           B.   October 11, 2021 shipment.

15           As previously described, on or about October 11, 2021,

16   St. Louis sent an audio message via What's App to Tunis

17   stating:  "I sent two barrels and I have other firearms inside

18   of it.  They sent the barrels for $400.  The barrels went to

19   Laboule 16."

20           Based on law enforcement's knowledge of the

21   investigation, Laboule 16 refers to a location south of

22   Port-au-Prince.

23           As previously described, St. Louis purchased firearms

24   on or about October 6, 2021.

25           C.   October 19, 2021 shipment.

1        According to location data stored on Tunis' phone, on

2    or about October the 18th, 2021, at approximately 9 a.m.

3    Eastern time, Tunis' phone was located at longitude/latitude

4    coordinates which corresponded to the location of St. Louis'

5    address, and is consistent with Tunis obtaining items for

6    shipment from St. Louis.

7        As previously described, based on law enforcement's

8    review of photographs from Tunis' phone, Tunis wrapped the

9    firearms in garbage bags, loaded them into multi-gallon plastic

10   barrels, and then covered the firearms with various products,

11   such as clothes, shoes, and Gatorade.  Relevant to this

12   shipment, Tunis took photos of such shipment on or about

13   October 19-20, 2021.

14       October 19, 2021, at 11:07 a.m., took a picture of a

15   blue barrel with firearms wrapped in garbage bags.

16       On October 19, 2021, at 11:07 a.m., took a picture of

17   a blue barrel with a firearm wrapped in garbage bags.

18       On October 19, 2021, at 11:09 a.m., took a picture of

19   a blue barrel with firearms wrapped in garbage bags.

20       On October 20, 2021, 12 a.m., multiple barrels covered

21   in packing wrap.

22       Also found on Tunis' phone was the stored contact

23   information for first name Bwat, B-W-A-T, with a phone number

24   ending in 8097.  Law enforcement notes that in Creole Bwat

25   translates to box; more specifically, shipping box.

1             On or about October 18, 2021, Tunis' phone had a

2 nine-minute phone call with this contact.

3             On or about October 19, 2021, Tunis' phone had a

4 five-minute phone call with this contact.

5             On or about October 20, 2021, Tunis' phone had a

6 four-minute phone call with this contact.

7             Also, on or about October 20, 2021, Bwat's phone

8 placed a one minute 14 second phone call to Tunis.

9             Law enforcement submits that these phone calls are

10 consistent with the shipment to Haiti that occurred, or was

11 attempted, on or about October 19, 2021.

12             According to public information, the phone number for

13 Bwat, ending in 8097, is associated with a furniture company

14 located in Pompano Beach, Florida, which is owned and operated

15 by Individual 4.

16             Individual 4 is a Haitian-born U.S. citizen.

17 Individual 4 has a Florida registration for a box truck and a

18 cargo van.  Law enforcement notes that in some of Tunis'

19 pictures of barrels being sent to Haiti, there are displayed

20 couches and other furniture being loaded into a white box

21 truck, which is consistent with Tunis using Individual 4 to

22 ship firearms to Haiti.

23             Also, on or about October the 19th, 2021, Tunis sent a

24 What's App audio message to Coconspirator 1 saying that the

25 person picking up the shipment complained to Tunis that the

1    barrels were heavy.  Tunis stated to Coconspirator 1 that she

2    told the shipper it was filled with rice.  The shipper said

3    rise is not that heavy, but Tunis convinced the shipper to take

4    the barrels anyway.

5          Your Honor, again, that concludes the factual proffer.

6          I have Joseph Kenny available for cross-examination

7    for the defense.

8          THE COURT:  I guess I should speak before you turn it

9    over.  One of the issues that we need to discuss today is also

10   identity.

11         MS. KOONTZ:  Yes.

12         THE COURT:  I don't think you've --

13         MS. KOONTZ:  Yes.  As for the identity, your Honor,

14   prior to the hearing I submitted Government's Exhibit No. 1,

15   which is a series of photographs.  These photographs actually

16   came from Tunis' cell phone that was seized at the airport.  A

17   search warrant was obtained for the cell phone.  The photos

18   that I have submitted to the court, to defense, and to agent

19   Joe Kenny also has a copy of these pictures.

20         So I don't know how you want me to proceed.  If you

21   want me to go through the photos with agent Kenny now or do

22   that after cross-examination.

23         THE COURT:  I think you should do that now.

24         MS. KOONTZ:  OK.

25         MR. EIGLARSH:  Your Honor, it might not be necessary,

Kenny – Cross

1    Judge.  We are going to stipulate to ID.  I spoke with my

2    client and, in the interest of time, that is not necessary.

3            THE COURT:  All right.  Thank you very much.  I

4    appreciate the stipulation that Ms. Eliande Tunis is not

5    contesting that she is in fact Eliande Tunis that the other

6    district is looking for.

7            MR. EIGLARSH:  That is the sole issue that we are not

8    contesting.

9            Again, Ms. Tunis, that is regarding that you are the

10   same person that they want in D.C.  That's it.  We are not

11   agreeing that what they just said is true in any way.  OK?

12           THE COURT:  All right.

13           MR. EIGLARSH:  She understood.  She nodded her head.

14           THE COURT:  We can skip the identity part of this

15   hearing.

16           Anything further from the government in terms of

17   evidence?

18           MS. KOONTZ:  No, your Honor.

19           THE COURT:  All right.  Thank you.

20           Mr. Eiglarsh, do you wish to cross-examine the agent?

21           MR. EIGLARSH:  I do.  Thank you, Judge.

22   CROSS EXAMINATION

23   BY MR. EIGLARSH:

24   Q   Agent Kenny, what was your role in this investigation?

25           THE COURT:  Well, let's swear him in.

Kenny - Cross

1    THE DEPUTY CLERK:  Agent Kenny, please raise your

2    right hand to be sworn.

3    Do you solemnly swear that the testimony you are about

4    to give will be the truth, the whole truth, and nothing but the

5    truth so help you God?

6    THE WITNESS:  Yes, ma'am, I do.

7    THE DEPUTY CLERK:  Thank you.  State your full name

8    for the record, please.

9    THE WITNESS:  Joseph Kenny.

10   THE COURT:  Thank you.

11   MR. EIGLARSH:  May I proceed, your Honor?

12   THE COURT:  Yes.  Thank you.

13   BY MR. EIGLARSH:

14   Q   Agent Kenny, what is your role in this investigation?

15   A   In this investigation it's been minimal.  I did assist with

16   the transport of Tunis as well as St. Louis.  For Tunis, I only

17   transported her from the jail to FDC, and St. Louis I

18   transported from the field office to BSO.

19   As far as other help with the investigation, I've done

20   a couple of interviews and followups for the Haiti squad that

21   is working this.

22   Q   OK.  So during the transport of my client, did you ever ask

23   her to explain anything that the government is alleging?

24   A   No, sir.

25   Q   Do you know, other than that transport time, whether any

Kenny - Cross

1    agent has sat down with my client to confront her with this

2    evidence and have her explain what she calls a complete

3    misunderstanding?

4    A    Yes, sir.  Agents have interviewed her in reference to the

5    data that has been pulled from her phone.

6    Q    OK.  Do you know what her responses were?

7    A    I haven't reviewed the interview or spoken with the agents

8    about the information that was pulled from that interview;

9    however, I do know that there was a written note that was done

10   with her that she actually hand wrote and went through details

11   of the allegations.

12   Q    OK.  But for purposes of this hearing today, where the

13   government is seeking pretrial detention, you don't know what

14   words flowed from her lips when confronted with the evidence,

15   correct?

16   A    I've been provided the notes that she had written out, and

17   in that letter she does speak about everything that we have

18   discussed or the main parts of it, sir.

19   Q    Well, discussing it and knowing precisely what she is

20   saying concerning each piece of evidence is very different.

21          Do you know what she's saying as to each piece of

22   evidence?

23   A    To go between each piece of evidence, but she does claim

24   that she is part of 400 Mawozo.  She did state that she was

25   buying these or getting these weapons to ship to Haiti for 400

Kenny - Cross

1  Mawozo.

2  Q   Do you have that statement recorded somewhere?

3  A   I do not know that answer.  I do know it's written, though,

4  sir.

5  Q   Written in her handwriting?  What you just said she wrote

6  in her handwriting, I am a member of the gang?

7  A   So I'm not going to say that's verbatim, and I can't tell

8  you if that was her handwriting.  I wasn't present for that

9  interview.  But based on my knowledge of the notes, that is her

10 handwriting as she goes through and signs, along with the

11 agents that were conducting the interview.

12 Q   Do you have that document or those documents with you today

13 so we can see what it is that she allegedly said?

14 A   I don't have them with me here today, no, sir.

15         MR. EIGLARSH:  I don't know what that noise is.  Is

16 there a train running through the courthouse?

17         THE WITNESS:  Probably.

18         MR. EIGLARSH:  All right.

19 BY MR. EIGLARSH:

20 Q   Agent, was there any DNA evidence found on any weapons?

21 A   Not to my knowledge.

22 Q   Was there any DNA found on any packaging or any other

23 evidence that was seized by law enforcement?

24 A   I do not know.

25 Q   Was there any fingerprint evidence linking my client to any

Kenny – Cross

1    of those weapons?

2    A   I do not know.

3    Q   Any fingerprint evidence on any packaging or other evidence

4    seized by law enforcement?

5    A   I do not know, sir.

6    Q   Now, the statements that are attributed to my client that

7    are alleged in the complaint, did you listen to what she

8    actually said?

9    A   No, sir.  Like I said, I wasn't a part of any of those

10   interviews, and minimally I've done the transport of her where

11   she didn't speak much.

12   Q   The statements that she allegedly made that are contained

13   in the complaint were made in Creole, correct?

14   A   Can you restate that?

15   Q   The statements --

16   A   Are you talking about the handwritten statement or --

17   Q   No, I'm talking about -- there is no reference of any

18   handwritten statements in the complaint --

19   A   Correct.

20   Q   -- nor was it part of the government's proffer.

21        I'm talking about, the government just made a proffer

22   based upon the complaint, and in there it is alleged that my

23   client said certain things.  Those things were all said in

24   Creole, weren't they?

25   A   I'm not sure what language each of them were said in.  I

Kenny - Cross

1    think there may have been a mix.  However, if there was any

2    Creole, it was translated by one of our Creole translators for

3    the investigation.

4    Q    And so what we see in the complaint is merely what the

5    interpreter claims my client was saying, correct?

6    A    Correct.  It would have been a translation from the Creole

7    speakers.

8    Q    OK.  And you have no firsthand knowledge of whether the

9    translation that was done by the Creole interpreter was done

10   accurately for all the words that were listed in the complaint,

11   isn't that correct?

12   A    I do not speak Creole, so no.

13   Q    Now, in the complaint it's alleged that Ms. Tunis

14   "regularly contacted what your affiant believes are the phone

15   numbers utilized by Coconspirator 1."

16         So there is some belief there.  What is that belief

17   based upon?

18   A    From my understanding, there was a phone data analysis that

19   was conducted by either our intelligence analyst, but I'm not

20   sure of the connection there as far as where they got the

21   information from that connects those individuals to

22   Coconspirator 1.

23   Q    So you have no idea, then, as you sit here why it's

24   believed that the person that she spoke to on 88 occasions was

25   actually Coconspirator 1 who the government's claiming is the

Kenny - Cross

1   leader of this gang, correct?

2   A   Based off of phone data analysis and then the dump of her

3   cell phone, it is believed that those are who we say they are

4   in the complaint.

5   Q   It's also alleged in the complaint that Tunis, Dor and St.

6   Louis filled out false ATF forms stating that they were the

7   actual buyers of firearms.

8       Do you actually have my client's signature on any of

9   those forms?

10  A   I haven't reviewed those forms, so I'm not sure what

11  signatures are on them.  That would have been the case agent

12  that drafted the complaint.

13  Q   When somebody's purchasing a weapon, they don't require

14  three signatures; they just require one signature, correct?

15  A   I don't know that answer.

16  Q   It's also alleged that at some point my client allegedly

17  met with Dor in Orlando, and that was based upon cell phone

18  records.

19      Is there any eyewitness at all that places my client

20  in Orlando at the time that it's being alleged other than these

21  alleged cell phone records?

22  A   Not that I know of, sir.

23  Q   And furthermore, it's alleged that my client then returned

24  to South Florida at a specific time.  There's no eyewitnesses

25  that corroborates that it was she that was then returning to

Kenny – Cross

1    South Florida after allegedly meeting with Dor, isn't that

2    correct?

3    A    Not to my knowledge, sir.

4    Q    And also, the prosecutor led with this kidnapping in Haiti

5    that many of us have seen in the news, an abhorrent offense of

6    kidnapping innocents, including children, but they were all

7    Americans.

8          Do you have any evidence whatsoever that my client

9    directly in any way participated in this abhorrent offense?

10   A    We have shown her connection to the gang who has come out

11   in social media taking action saying that they were the

12   kidnappers.

13   Q    That wasn't my question.  That wasn't my question.  My

14   question was very specific.

15         Do you have any evidence that she directly was

16   involved in this kidnapping?

17   A    Not to my knowledge.

18   Q    There's no evidence that she was there when it occurred,

19   correct?

20   A    Not that I know of.

21   Q    Nor is there any evidence that any of these alleged guns

22   that the government's claiming she sent to Haiti were in the

23   hands of any of the gang members and were utilized during this

24   alleged kidnapping, correct?

25   A    No.  We're focusing on the attempted export or export of

Kenny - Cross

1   these weapons, so --

2   Q   I understand.  OK.

3        None of the guns that you are claiming were exported

4   ever, then, remained in the United States, correct?

5   A   I'm not sure, sir.

6   Q   There's no allegation that my client purchased any weapons

7   for use within the United States, isn't that correct?

8   A   I don't know that answer, sir.

9   Q   Has anyone ever shared any evidence or even an allegation

10  that my client purchased weapons that were for use within the

11  United States?  Yes or no.

12  A   She had purchased a Ruger to be transported to Haiti.

13  Q   I understand that.  So now I'm asking you, were any of the

14  weapons that the government claims that she purchased for the

15  intention of use within the United States?

16  A   I don't think she planned to use any of them within the

17  United States that I know of, sir.

18  Q   OK.  So that was my question.  Thank you.

19        There's also -- I reviewed the complaint very

20  carefully numerous times.  I didn't see any evidence detailing

21  what specific purpose my client allegedly sent these guns to be

22  used for, whether it be hunting or sport shooting or something

23  nefarious, as is intimated by the government.

24        Do you have any evidence of that?

25  A   That is correct, but that is not our issue in the case.

Kenny - Cross

1    The issue is that there wasn't any paperwork signed declaring

2    those were being sent over, which is --

3    Q    I understand.

4    A    -- a violation of the ECRA.

5    Q    So would the answer then be no, that you have no evidence

6    of what the intention of those guns were for, assuming my

7    client even sent them?

8    A    Not that I know of, sir.

9    Q    OK.  Do you have any evidence at all that my client took

10   money from her employer, because that was clearly alleged in

11   the complaint?  What evidence do you have of that?

12   A    It's the wire transfers from or it's the checks from that

13   subject to her, who she --

14   Q    How much money -- I'm sorry.  I didn't mean to interrupt.

15   Go ahead.  Finish.

16   A    No, you're fine.

17   Q    Was there anything more you wanted to say about that?  I

18   did cut you off, and I apologize.

19   A    No, you're fine.  I think you're asking the amount.

20   Q    Yes.  That was my next question.  Yes.

21   A    I believe the check amount was for $15,000 that was given

22   to her, which she stated was a reward for this subject falling,

23   part of a total of an $80,000 reward amount.

24   Q    I didn't see that information in the complaint.  Thank you

25   for providing that to us.

Kenny - Cross

1        Did you verify whether that was true or not?

2   A   I know very minimum knowledge.  I know about the case agent

3   speaking to her in reference to those checks that were

4   deposited.

5   Q   OK.

6   A   And --

7   Q   She gave an explanation as to how she was properly

8   rewarded, that money from her employer, but we're left in the

9   complaint erroneously believing that she stole money from her

10  employer, right?  That would be a fair reading of what is

11  alleged in the complaint, right?

12  A   Well, what you are reading, she is a home health nurse who

13  is getting that money from this guy --

14  Q   Right.

15  A   -- which the FBI believes is from fraudulent means, as far

16  as her defrauding this individual.

17  Q   OK.

18  A   However, that's still under investigation, though.

19  Q   Other than my client's statement explaining how she didn't

20  get it from any nefarious purpose, you have nothing more to add

21  on that subject matter today, correct?

22  A   Not that I know of today, sir.

23  Q   OK.  Do you have any -- I'm finishing up, by the way.

24        Do you have any evidence at all that she financially

25  benefited in any way from these alleged actions?

Kenny - Redirect

 1   A   Not from my knowledge, sir.  No.

 2   Q   Do you have any -- well, not necessary to prove, but do you

 3   have any evidence that proves any motive as to why she would

 4   have helped some gang in Haiti?

 5   A   Not to my knowledge, sir.

 6            MR. EIGLARSH:  OK.  Judge, that's all I have for

 7   questions.  I do have a lot that I want to proffer to the court

 8   in terms of ties to the community.

 9            THE COURT:  All right.  Thank you.

10            Anything else on a redirect from the government,

11   Ms. Koontz?

12            MS. KOONTZ:  Yes, I do.  I do, your Honor.

13   REDIRECT EXAMINATION

14   BY MS. KOONTZ:

15   Q   Agent, you were asked extensively about, I believe you

16   called it a note, is that correct --

17   A   Yes, ma'am.

18   Q   -- that was authored by the defendant?

19   A   Yes, ma'am.

20   Q   This note was actually, basically a three-page confession,

21   is that correct?

22   A   Yes, ma'am.  That's correct.

23   Q   And in that letter, did she admit to purchasing firearms

24   for Haiti?

25   A   Yes, ma'am, she did.

Kenny - Redirect

1    Q    And did she admit to purchasing ammo for Haiti?

2    A    Yes, ma'am, she did.

3    Q    Did she admit to sending the ammo and the firearms she

4    purchased to Haiti?

5    A    Yes, ma'am, she did.

6    Q    OK.  Did she also admit to being involved with the

7    coconspirators St. Louis and Dor to purchase the firearms and

8    to send those firearms to Haiti?

9    A    Yes, ma'am.

10   Q    OK.  Do you know if a search warrant was executed on her

11   phone at the airport?

12   A    I'm not sure where that search warrant was executed on the

13   phone.  I don't have knowledge of that.

14   Q    Do you know --

15   A    I know she came to the airport with two phones.  One was a

16   Haiti-based phone, which she said didn't work in the U.S., and

17   the other one was her U.S. phone.  She gave consent to search

18   the Haiti phone and the search warrant was what was obtained

19   for the U.S. phone.

20   Q    When did she come back from Haiti?

21   A    I don't recall the exact date.

22   Q    I mean, was it a few weeks ago, a few years ago?

23   A    I believe it was a few weeks, but I'm not sure, ma'am.

24   Q    OK.  So it's been within a month, correct?

25   A    Correct.  She flew in with -- they met her at the airport.

Kenny – Redirect

1   The agents, based off the phone data analysis, were able to

2   find this phone memory linked to her and then based on record

3   checks were able to see she was flying into Fort Lauderdale,

4   which is where they ended up making contact with her.

5   Q   OK.  And eventually, whether it was executed at the

6   airport, they eventually, you –- know they executed a search

7   warrant on her cell phone?

8   A   Yes, ma'am.

9   Q   OK.  Because I sent you Government's Exhibit No. 1, which

10  was submitted into evidence, correct?

11  A   Yes, ma'am.

12  Q   OK.  And what were those pictures that are in Government's

13  Exhibit No. 1?

14          THE COURT:  I'm sorry.

15  A   In these photos --

16          THE COURT:  I don't think Government Exhibit 1 is in

17  evidence yet.  I think we started to talk about it when

18  Mr. Eiglarsh stipulated to identity.

19          So are you moving in Exhibit 1?

20          MS. KOONTZ:  I am.

21  BY MS. KOONTZ:

22  Q   If you can tell me what Exhibit No. 1 is, please.

23          MS. KOONTZ:  I'll move it into evidence.

24  Q   Agent.

25  A   Exhibit 1 is going to be the photos that were dumped from

Kenny - Redirect

1  her cell phone whenever we executed the search warrant on her

2  phone.  There are a series of photos in here that we have that

3  are date and time stamped.  As we go through them, you can see

4  on October 9, 2021, at 3:09 --

5  Q   Hold on one second.  Before we talk about them.

6            MS. KOONTZ:  Your Honor, I would move Government

7  Exhibit No. 1 into evidence before we talk about it.

8            THE COURT:  Any objection, Mr. Eiglarsh?

9            MR. EIGLARSH:  If he can certainly make them relevant.

10           THE COURT:  Well, I think he's just testified that

11  these are phones that were downloaded from the phone that was

12  searched, her phone.  That seems to be rather relevant.

13           MR. EIGLARSH:  Well, I think the court is going to

14  admit them.

15           THE COURT:  Yes, I think you're right.

16           MR. EIGLARSH:  Yes.

17           THE COURT:  Admitted.

18           So these are photographs that were downloaded from her

19  cell phone, correct, agent?

20           THE WITNESS:  Yes, ma'am.  Yes, your Honor.

21           THE COURT:  In which there was a federal search

22  warrant?

23           THE WITNESS:  Yes, your Honor.

24           THE COURT:  All right.  Admitted.

25           (Government's Exhibit 1 received in evidence)

Kenny - Redirect

1    BY MS. KOONTZ:

2    Q   OK.  Agent, if you could start and just go to the first

3    page and let's talk about them in order so we keep, our

4    comments, we can kind of keep them in order.

5            So the very first photo of that top first page, what

6    is that a picture of?

7    A   That's a photo of the inside of one of these blue barrels

8    that she was using to ship the firearms.  She's going back to

9    some of the articles that she was using to conceal the firearms

10   to give an indication of where it was located in the barrel.

11   Q   OK.  Again, that is date and time stamped?

12   A   Yes, ma'am, at October 9th, at 3:09 p.m.

13   Q   OK.  The middle photo on that page, what is that a picture

14   of, if you know?

15   A   Did you say the middle photo, ma'am?

16   Q   Yes.

17   A   That's also the inside of one of the barrels.  It's a

18   little bit blurry, but it is the firearms that are wrapped in

19   the garbage bags that she refers to in the complaint.

20   Q   OK.  And the last bottom picture?

21           THE COURT:  Mr. Koontz, I'm sorry.  Can I stop you for

22   a minute?  I was just trying to see --

23           MS. KOONTZ:  Oh, sure.

24           THE COURT:  -- if my CRD had a better photograph.

25           The second photograph, which is time stamped at 4:14,

1   I think --

2           THE WITNESS:  Yes.

3           THE COURT:  -- 4:14:46, there seems to be like half a

4   picture missing, right, or is that just my copy?

5           THE WITNESS:  It is probably just the way it is up and

6   down, whenever they probably cropped the photos.

7           THE COURT:  I'm sorry, agent.  Can you repeat whatever

8   you said.

9           THE WITNESS:  Yes, your Honor.  I believe that is the

10  way it is.  It is just up and down from where they pulled it

11  from the data dump on the phone.

12          THE COURT:  All right.  That's what you have.  OK.

13          And what is it a picture of?  I can't make out what it

14  is a picture of.

15          THE WITNESS:  So that's the photo of the firearms that

16  are wrapped in the plastic wrap or the garbage bags indicated

17  in the complaint.

18          THE COURT:  Thank you.

19          THE WITNESS:  And that's inside one of the blue

20  barrels or drum.

21  BY MS. KOONTZ:

22  Q   And how about the bottom picture on that page, what is that

23  a picture of?

24  A   This is on 10/20/2021, and these are photos of the barrels

25  all wrapped up prepared for shipment, as indicated in the

Kenny – Redirect

1  complaint as well and in the proffer that these are photos that

2  she took after they had been packaged in the plastic wrapping

3  on the top.

4          THE COURT:  Agent, can I just clarify something you're

5  saying.  The photos she took.  You don't know who took them.

6  You know they were on her phone.  Is that a fairer statement?

7          THE WITNESS:  Yes, your Honor.

8  BY MS. KOONTZ:

9  Q   OK.  Turning now to the second page.  Explain that top

10 photo, please.

11 A   In the top photo is the photo of the firearms on October

12 19th wrapped in garbage bags and plastic at the bottom of the

13 blue barrel.

14 Q   And the bottom photo of that page, what is that?

15 A   The bottom photo is just showing on October 9th, 3:20 p.m.,

16 just the kind of items that she was using to conceal the items

17 that are inside these barrels, and this one appears to be a

18 blanket.

19 Q   OK.  Moving on to the third page.  That appears, the top

20 photo there appears to be some type of book.

21          Do you know what book that is?

22 A   I'm having a hard time making it out myself on the photos

23 that are provided.  However, it is a rifle handbook.  I believe

24 it was from the Army, but don't quote me on that.  I can't

25 recall.

Kenny - Redirect

1   Q   OK.  And then that bottom photo is basically the same

2   photo, the same book, different angle?

3   A   Yes, ma'am.

4   Q   OK.  Now moving on to the fourth page.  What is that top

5   photo, please, and when was it taken?

6   A   The top photo is on October 9, 2021, at 12:41 p.m., and

7   this is an indication of all the ammunition that was purchased.

8   You can see the cases of ammunition, a couple of them actually

9   being opened.

10  Q   OK.  And the bottom photo on that page, what is that?

11  A   The bottom photo is on October 9th, at 3:12 p.m., and

12  that's also indicating the kind of articles of, items that they

13  were putting on top of the barrels in order to conceal the

14  weapons during transport.

15  Q   OK.

16  A   So Gatorade juice.

17  Q   And the next page, the top photo, please.

18  A   This top photo is October 11th, at 7:26 p.m.  This is also

19  another photo of ammunition 5X7X28 millimeter, and these would

20  be referred to as the pointy bullets.

21  Q   And the bottom photo of that page, is that just a different

22  angle of that same box of ammo?

23  A   Yes, ma'am.  It's the top angle of that box.

24          THE COURT:  Agent, I have a question for you.  I

25  remember during Ms. Koontz's proffer there was a conversation

Kenny - Redirect

 1   with C1 where C1 rattled off a series of numbers.  Do those

 2   numbers match with these numbers?

 3           THE WITNESS:  So I'd have to look at the back of the

 4   casing, but it is consistent with what they are looking for

 5   there.  She made the comment of "it's on the butt, baby."  She

 6   is more than likely referring to the butt of the casing, which

 7   around the circle will tell you the caliber.

 8           THE COURT:  Specifically at page 15 of the complaint

 9   affidavit, paragraph 41, under Ruger pistol, paragraph 41,

10   there is a Coconspirator 1 speaking in a text message and he

11   says:  5.7X28 Ruger 57 Prescott.

12           THE WITNESS:  So that --

13           THE COURT:  So I guess the answer to my question is

14   the numbers do match.

15           THE WITNESS:  Yes, your Honor, they are consistent

16   with that casing.

17           THE COURT:  All right.  Thank you.

18   BY MS. KOONTZ:

19   Q   And then the following page, if you could tell us what's on

20   the top left photo of the following page.

21   A   Sure.  On the top left, on September 14th, at 11:33, it

22   appears to be a screenshot of a semi-safe auto, and this is the

23   full auto serial for a weapon.  So for the AR-15 it would be

24   able to be switched from a single shot all the way to full

25   auto, where you can hold the trigger and it continues to cycle

Kenny – Redirect

1    and fire.

2          THE COURT:  I'm sorry, agent.  Is it your testimony

3    that this has to do with an AR-15 rifle?

4          THE WITNESS:  I'm not going testify as far as what

5    rifle it would go to; however, it could make a semiautomatic

6    rifle to a full automatic rifle.

7          THE COURT:  OK.  I thought you said AR-15 or did I

8    just make that up?

9          THE WITNESS:  Such as an AR-15.  So that's just a type

10   of rifle.  Yes, ma'am.

11         THE COURT:  All right.  You used it as an example.

12   BY MS. KOONTZ:

13   Q   OK.  And the photo on the right, who is that?

14   A   On the top right is going to be the defendant, Ms. Tunis.

15   Q   OK.  And again in that photo, on her arm you see some

16   tattoos, correct?

17   A   From my printout it's hard to see, but yes, it seems like

18   she's got the Jolie tattoo on her forearm.

19   Q   And some of the photos that were on her phone, like holding

20   firearms and whatnot, are there actually photos that capture

21   also her tattoo?

22   A   Yes, ma'am, there are.

23   Q   OK.  Now turning to the bottom left-hand photo on that same

24   page, it is date marked 10/6/2021.  It is 7:42 p.m.  What would

25   that be?

Kenny - Redirect

1   A   That is going to be another photo of a firearm.

2   Q   OK.  Then if you know the photo on the right.  Do you

3  happen to know who that is a photo of or what that depicts?

4   A   It depicts an individual holding a firearm.  As far as the

5  identity of that person, I do not know.

6   Q   OK.  Let's move on to the following page.

7   A   On 9/29/2021, at 6:07 p.m., that appears to be a photo of a

8  magazine that holds ammunition.

9   Q   OK.  The picture next to it?

10  A   Next to it is the 9/27/2021, at 6:45.  It appears to be a

11  screenshot of Sportsman's Warehouse, which is an outdoors

12  store.  In the screenshot I can see a magazine indicated as

13  well as a rifle.

14  Q   And go on to the middle pictures, please.

15  A   Yes, ma'am.  The photo 9/21, 9:47 p.m., it appears that

16  whoever is taking the photo is inside of a gun store, a pawn

17  shop, with the sales rep showing them a photo of a rifle.

18  Q   OK.  And the photo to the right of that, if you know.

19  A   The photo to the right of that is on October 1, 5:21 p.m.

20  It is also a photo of a magazine which appears to be inside of

21  a plastic bag.

22  Q   OK.  The bottom photo, who does that depict?

23  A   The bottom photo is a photo of St. Louis holding a rifle,

24  trying to conceal it from his face.  Also, it is speaking

25  with -- this is also a live photo, so you can see St. Louis

Kenny - Redirect

```
 1  moving around.
 2  Q   Following page, please, the top picture, that is dated
 3  10/14/2021, 3:27:47 p.m.
 4          THE COURT:  I'm sorry.  I don't have that.  My exhibit
 5  ended.  Maybe I ran out of paper.  Do you have another one?  I
 6  end with the bottom picture of the individual holding the gun.
 7          Is that your last page?  OK.  I was missing a page.
 8  I'm sorry.  OK.  Next one is, you said, 10/15/2021.
 9          THE WITNESS:  10/14, your Honor.
10          MS. KOONTZ:  The one we have is 10 -- I think that
11  might be the last page, the 10/15 one.  The one I was going to
12  refer is the 10/14.
13          THE COURT:  All right.  Give me a second.
14          MS. KOONTZ:  OK.
15          THE COURT:  What is the page you have after this one?
16          THE WITNESS:  It's going to be a photo of two
17  handguns, if that helps.
18          THE COURT:  Thank you.  Sorry about that.
19          All right.  Thank you.  I'm good now.  10/14/2021 at
20  3:47.
21          MS. KOONTZ:  Yes.
22          THE COURT:  OK.  Thank you.
23          THE WITNESS:  3:27:47.
24          That is going to be the butt of a revolver pistol on
25  the left and then a semiautomatic pistol on the right.
```

Kenny - Redirect

1   BY MS. KOONTZ:

2   Q    OK.   What is the significance of the bottom two papers,

3   pictures?

4   A    The bottom two photos, at 6:22:56 p.m. on 10/10 -- well,

5   both at the same time.   That is a pawn shop receipt that was

6   referred to by St. Louis, with the total amount from the three

7   weapons that he had purchased.

8   Q    OK.

9            THE COURT:   What was the total amount?   Was that 2500,

10   if I recall?

11           THE WITNESS:   That is how much was wired to him.   The

12   actual amount is -- I can pull it up here in the complaint.   It

13   was 22 something, I believe.   2216.

14           THE COURT:   2855.   Paragraphs 38 and 39.

15           THE WITNESS:   2855, yes, ma'am.

16           THE COURT:   So this receipt was for 2855, is that what

17   you are saying?

18           THE WITNESS:   Yes, ma'am.

19   BY MS. KOONTZ:

20   Q    The significance of this as it relates to the letter that

21   Tunis wrote, did she admit to going to the Lucky Pawn shop to

22   purchase weapons or have weapons purchased?

23   A    Yes, ma'am, she did.

24   Q    All right.   The last page, the top photo is dated

25   10/15/2021, 7:28.   What is that, please?

Kenny - Redirect

1  A   That is a photo of a firearm, black firearm, gun, with the

2  sling.

3  Q   OK.  The middle photo?

4  A   10/7/2021, 3:22 p.m. is also a photo of a firearm inside of

5  a box.

6  Q   And again that last photo, the bottom photo.

7  A   That photo is another photo of St. Louis holding a firearm

8  in what appears to be a pawn shop or a gun store, trying to

9  conceal his face with the firearm.

10 Q   Now, in that letter that we've referenced, she also

11 admitted to receiving money from Haiti to purchase these

12 weapons, is that correct?

13 A   Yes, that's correct.

14      THE COURT:  Did she say who she received the money

15 from in Haiti?

16      THE WITNESS:  I don't recall.  I believe she just said

17 I received the money from Haiti to purchase firearms and

18 ammunition.

19      THE COURT:  During that statement did she say she

20 admits to the conversations with the individual that you

21 describe as Coconspirator 1?

22      THE WITNESS:  She did.  She did admit to conversations

23 with both Coconspirator 1 and Individual 2.

24      THE COURT:  Did she discuss the substance of those

25 conversations?

Kenny - Redirect

```
1              THE WITNESS:  I do not recall, your Honor.
2    BY MS. KOONTZ:
3    Q   In that letter, did she detail who she was working with to
4    purchase the guns and send them to Haiti, with the names of
5    individuals?
6    A   She did detail them.
7              THE COURT:  I'm sorry.  Can you repeat your question?
8              MS. KOONTZ:  Did she detail who exactly she was
9    working with to purchase the guns and to ship them to Haiti.  I
10   asked if she detailed the names in the letter, and he responded
11   that she had.
12   BY MS. KOONTZ:
13   Q   In the letter, do you recall did Ms. Tunis express remorse
14   for doing what she did?
15   A   She did, and that is why she was cooperating with the FBI.
16   Q   As part of her statement, did she also initial pictures of
17   some firearms that she had put a deposit on?
18   A   I do not recall.
19   Q   OK.  Do you know how many times she's traveled to Haiti?
20   A   Not to my knowledge, no.
21             MS. KOONTZ:  That's all I have, your Honor.
22             THE COURT:  Thank you.
23             Mr. Eiglarsh, any limited recross based on the
24   redirect?
25             MR. EIGLARSH:  Very few, Judge.
```

Kenny - Recross

1    RECROSS EXAMINATION

2    BY MR. EIGLARSH:

3    Q   You testified in photo No. 1, she's moving back items to

4    show where the guns are in the barrel.  That was your

5    testimony, correct?

6    A   Yes, sir.

7    Q   First, I'm looking at that photograph.  How do you know

8    that that's her in the photograph?  I see a hand that shows

9    someone that has dark skin.  That's all I see.  How do you know

10   that that's her?

11   A   Based on the photos being pulled from her phone.

12   Q   But you even told the judge you don't even know how the

13   photos got into her phone, correct?

14   A   Correct, but I didn't make a misstatement saying that it

15   was her.

16   Q   But you went further.

17   A   I don't have a way of knowing whether that was her.

18   Q   Not only was the misstatement that it was her, but you even

19   further went into her intent or the person's intent of moving

20   items around.  You actually said, under the penalties of

21   perjury, that the intention of her was to show where the guns

22   were located in the barrel.

23        Where is that proof?

24   A   So it's just showing, pulling back to show where the

25   firearm is in the barrel.

Kenny - Recross

1  Q   Is that one of the many things that is allegedly contained

2  in this detailed confession on this paperwork that we don't

3  have?

4  A   Say again.

5  Q   Did she allegedly state in this alleged confession on

6  paperwork, that we don't have in evidence, that it was her

7  lifting up items from the barrel so that she could show where

8  the guns were actually located?

9  A   Not that I recall, sir.

10 Q   In fact, isn't the best evidence of what she allegedly said

11 in her statement the actual statement itself?

12 A   Based on the interview with the agents, the statement that

13 she made as well as the phone dump with all of the photos and

14 text messages on her.

15 Q   But where is her alleged, this thing that you keep talking

16 about, this alleged handwritten statement where she makes

17 confessions, where is that located?  Where is it?

18 A   It's in a file at the FBI.

19 Q   OK.  Any particular reason why it's not here so that we can

20 actually see what she wrote?

21 A   I mean, we have no issues with it coming out in discovery

22 anyway, so I mean --

23 Q   OK.  All right.  Thank you.

24 A   No problem.

25         MR. EIGLARSH:  I have nothing further.

```
 1              THE COURT:  Anything further, Ms. Koontz?

 2              MS. KOONTZ:  No, your Honor.

 3              THE COURT:  All right.  Mr. Eiglarsh, anything in

 4    terms of evidence or a proffer?  Not argument.  Save argument

 5    for last.

 6              MR. EIGLARSH:  Not regarding the evidence.  Well, yes.

 7    I do have ties.  Do you want me to just handle the evidence

 8    first and then go to ties?

 9              THE COURT:  Well, if you are going to proffer her

10    ties, we will do that and then I will turn to the government

11    for argument and then your response.

12              MR. EIGLARSH:  OK.  So this is someone who is 43 years

13    of age, no priors at all, lived in the U.S. more than 30 years.

14    She is a U.S. citizen.  The government has her passport, so she

15    can't go anywhere.

16              She works as a home healthcare provider.  Her client

17    is a private client in Boca Raton.  His name is Larry, like my

18    father.  Objection.  Relevance.  She's been working in this

19    field for over five years.

20              Her husband, Eric Alice, who is just a darling man.

21    He is just the best.  He is listening, by the way, and so are

22    other family members.  They have been together for 25 years,

23    legally married for 13 years.  They live together in Pompano

24    Beach in their home.  That home is located at 2951 Northeast

25    10th Terrace, in Pompano Beach, Florida.  They have lived there
```

1    for approximately five years.  They have approximately $100,000

2    in equity in their home.

3         Together they have three wonderful children, and from

4    everyone I've spoken to, my client is the perfect mother.

5    She's loving, she's caring.  She's very attentive to their

6    needs.  They have a 21-year-old daughter, Kaylanda Tunis, who

7    is a U.S. citizen, also lives with my client in the same

8    Pompano Beach home.  She plays basketball for her college.

9         They also have another daughter, Erica Tunis, who is

10   16 years of age.  She lives also with my client and her husband

11   in their Pompano Beach home.  She is at Pompano Beach High

12   School.  I'm told that she's been given a full academic

13   scholarship to the college of her choice because of her

14   superior performance in academics.

15        Finally, there is Leona Tunis, who is 9 years old,

16   also a U.S. citizen, lives in the same home as my client and

17   her husband, who attends Pompano Middle School.

18        I want to turn to the presentence investigation.  The

19   PSI recommends a percentage and personal surety bond with two

20   cosigners with special conditions.  I am OK with what they are

21   recommending.

22        The two cosigners would be her husband, Eric Tunis,

23   and her sister Flora Tunis, who is also listening.  She is a

24   mother of five children in Pompano Beach and is a chef.

25        The only special condition that I take exception to is

```
 1    travel being restricted to the Southern District.  She
 2    obviously will need to go to D.C. to challenge this case,
 3    because I believe that is where this case is being heard.
 4            They have her passport, so no travel.
 5            That's it.  I think that that is a reasonable bond.  I
 6    think that there are a lot of extenuating circumstances in this
 7    case, and it will all be saved for the future when we actually
 8    get the evidence and can thoroughly review it and then have my
 9    client respond to it.
10            THE COURT:  All right.  Thank you.
11            Ms. Koontz, I will hear from the government.
12            MS. KOONTZ:  Yes, your Honor.  First of all, I want to
13    argue as to danger to the community.  Honestly, she is a member
14    of one of the most brutal gangs in the Caribbean.  This gang is
15    known for their violence, for their torture, for their rape.
16    They have been involved with the kidnapping of 17 missionaries.
17    They are now being held for ransom.  This is an Ohio-based
18    Christian faith ministry.
19            Your Honor, this woman was conspiring with others to
20    obtain firearms, to obtain ammunition, to send it to Haiti to
21    this gang, this very, very violent gang.  She is very dangerous
22    to the community.  She is very dangerous to the Americans that
23    are being held hostage in Haiti.
24            If she is released on bond, her connection to Haiti is
25    very strong.  Her father lives in Haiti.  She is a member of a
```

1   gang that I'm sure will work very hard to make sure that she is

2   compensated and rewarded for everything she has done for them

3   and assist in getting her back to Haiti.

4        Your Honor, there is absolutely no condition of bond

5   that would assure her appearance.  She is very dangerous.  Her

6   phone was filled with photos.  All the photos that she took of

7   all the ammunition and the firearms.  I mean, her statements,

8   how she is a snake and they slither and what if Mawozo came to

9   Miami, just think what would happen.  Your Honor, this is a

10  very dangerous individual.

11       She may work as a healthcare worker, but at the end of

12  the day she is extremely dangerous to not only Americans but

13  individuals residing in Haiti, because now she has supplied

14  guns to these very brutal and violent gangs.  So she is not

15  only a danger to the U.S. citizens that are down there, she is

16  a danger to the Haitians that are down there.

17       Not only that, I mean, the risk of flight.  I mean,

18  she is facing a substantial time in federal prison.  The

19  evidence is overwhelming, quite frankly, between her cell

20  phone, all the What's App.  I mean, she's authored a three-page

21  statement about her involvement.  The evidence is substantial.

22  It is strong.

23       There are absolutely no conditions that would assure

24  her appearance.  With her connection with this gang -- listen,

25  whether we have her travel documents or not, I am sure they

1    will do what they need to do to take care of her as she has

2    taken care of them.

3           Your Honor, the government highly, highly recommends

4    that she be held pretrial detention, that she be sent back to

5    the District of Columbia so she can answer to the charges

6    there, but in the meantime she needs to be detained pending her

7    appearance in D.C.

8           THE COURT:  According to --

9           MR. EIGLARSH:  Judge, can I please --

10          THE COURT:  I'm sorry.  According to the complaint as

11   I read it, the ECRA violation has a maximum penalty of 20

12   years, is that correct?

13          MS. KOONTZ:  That's correct.  Yes, your Honor.  I'm

14   sorry.  I didn't go over that.

15          THE COURT:  And the smuggling has -- also this is in

16   the complaint -- the smuggling has a ten-year max.

17          MS. KOONTZ:  That's correct, and the conspiracy a

18   five-year max, your Honor.

19          THE COURT:  All right.  I know you alluded to the

20   serious sentences, but I don't think the record reflected what

21   those were.

22          MS. KOONTZ:  You're right.  You're right.  Sorry.

23          THE COURT:  Mr. Eiglarsh.

24          MR. EIGLARSH:  Judge, just briefly if I can respond on

25   danger.  Look, our position is that this is a misunderstanding

1   and she is going to need to be able to explain each of these

2   things, and this isn't the proper forum because we don't have

3   all the evidence and I haven't sat down with her to do that.

4   That is what a trial is for.

5          The question is whether she is a danger to the

6   community, and there was zero evidence presented that any of

7   these weapons were intended -- again, her position is she's not

8   responsible -- but even if you embrace what the government is

9   suggesting, these weapons were intended for Haiti.  There's

10  been no proof that they had any ties at all -- at all -- to use

11  in any type of kidnapping or any type of nefarious purpose

12  whatsoever.

13         Furthermore, there is zero evidence that she did

14  anything here in the United States.  Zero danger to anyone here

15  in the United States.  That, coupled with her ties to the

16  community, I believe, justifies a release, particularly because

17  she has tremendous ties to this community here in South Florida

18  and no priors at all.

19         THE COURT:  All right.  Thank you, Mr. Eiglarsh.

20         I am prepared to rule on this matter.

21         This matter comes before the court on the government's

22  request that the defendant, Eliande Tunis, be detained pending

23  trial of this matter and, of course, ultimately her removal to

24  the District of Columbia.  So I will also be looking to

25  probable cause as part of this hearing to support the

```
 1   complaint.

 2             In considering the government's request, I am guided

 3   by several principles.  First of all, at all times the

 4   defendant is entitled to the presumption of innocence.  Nothing

 5   that takes place during this hearing or that I set forth in my

 6   findings of fact is intended or should be construed to affect

 7   that presumption.  Rather, the purpose of this hearing is to

 8   determine whether or not withstanding the presumption of

 9   innocence the defendant should be detained pending trial.

10             Second, under the Bail Reform Act, pretrial detention

11   is an exceptional step.  Under the Act a defendant must be

12   released prior to trial unless I find that no conditions or

13   combination of conditions exist which will reasonably assure

14   the appearance of the defendant if the government seeks

15   detention based on risk of flight and reasonably assure the

16   safety of any other person in the community if the government

17   seeks detention based on the defendant being a danger to the

18   community.

19             The Act requires that the least restrictive conditions

20   be imposed that are necessary to provide those reasonable

21   assurances.  However, if I cannot find any such conditions,

22   then I am required by the Act to order that the defendant be

23   held in custody.

24             In this case the government seeks detention based on

25   both crimes, risk of flight and danger.
```

1          In terms of danger, the government must show by a

2    preponderance of the evidence that no condition or combination

3    of conditions will reasonably assure the defendant's presence

4    as required.

5          In terms of danger to another or the community, the

6    government has a higher burden.  The government must show by

7    clear and convincing evidence that no condition or combination

8    of conditions will reasonably assure the safety of the

9    community.

10         The government alleges that in this case there is a

11   presumption under 3142(f)(1)(E) that applies because the crime

12   charged involves possession of a firearm or destructive device

13   specifically dealing with the exportation of firearms or the

14   smuggling of firearms.

15         In this case I find that the rebuttable presumption

16   applies, but honestly, even if it didn't apply, I think my

17   result would be the same based on the weight of the evidence.

18         The presumption is rebuttable.  This means that it can

19   be overcome by the defendant.  The effect of the presumption is

20   simply to place on the defendant the burden of producing some

21   credible evidence to rebut it.  The burden is not a heavy one.

22   Here, however, I find that the defendant has not offered any

23   evidence sufficient to rebut the presumption other than

24   arguments.  There's been no evidence, in fact, to rebut the

25   presumption.  As I said, I am really not going to rely on the

1    presumption in making my finding, but, rather, on the weight of

2    the evidence.  I note the presumption because it was brought up

3    during the hearing.

4         I now turn to the four specific factors that the Act

5    requires me to consider.

6         The four factors are, one, the nature and

7    circumstances of the alleged offense; two, the weight of the

8    evidence against the defendant; three, the history and

9    characteristics of the defendant, which includes the

10   defendant's physical and mental condition, family ties,

11   employment, length of residence in the community, community

12   ties, past conduct, criminal record, history of drug or alcohol

13   use, record of appearance at prior court proceedings, and

14   whether the defendant was on some kind of supervised or

15   conditional release at the time of the instant offense.

16   Lastly, the nature and seriousness of the danger to others in

17   the community.

18        I have considered all of the evidence on these factors

19   and I have also given consideration to the recommendation in

20   the Pretrial Services report.

21        As Mr. Eiglarsh noted, the Pretrial Services officer

22   does recommend a percentage bond and a personal surety bond

23   with two cosigners.  That is a recommendation.  I am not bound

24   to accept this recommendation, and in this case I will not

25   accept the recommendation.

1          Based on the evidence at the hearing I find that the

2    government has met its burden to establish that the defendant

3    poses a danger to others or the community and that it has met

4    its burden of showing so by clear and convincing evidence.  In

5    that regard, I adopt the government's proffer, which is really

6    verbatim from what was in the complaint.

7          That complaint, just to summarize the allegations in

8    the complaint, the defendant is part of, according to the

9    complaint, Tunis, who is a United States citizen, who was born

10   in Haiti, and her coconspirators, obtained weapons and

11   ammunition in the United States, as described in the complaint,

12   and sent those to Haiti to members of the 400 Mawozo gang

13   members, which is a very violent gang in Haiti.  To accomplish

14   this scheme, Tunis used straw purchasers, including

15   coconspirators Dor and St. Louis, and falsified ATF paperwork

16   to conceal the fact that they were not the ultimate purchasers

17   of these weapons; rather, that the guns were being sent -- guns

18   and ammunition were being sent to Haiti.

19          Notably, the evidence in this case is very strong.  It

20   includes not only the defendant's call records, it also

21   includes -- and that evidence includes actual communications

22   between Tunis and Coconspirator No. 1 on What's App, and these

23   are just examples of some of the items in the phone in which

24   the defendant tells Coconspirator 1:  "Don't worry about it,

25   stay calm.  You know we are 400 Mawozo and we are strong.  Keep

1    a cool head."  That conversation took place on October 19,

2    2021.

3            In another conversation on October 19th of 2021, Tunis

4    sent an audio file, meaning her voice, to Coconspirator 1 on

5    What's App in Creole where she states:  "We are snakes.  We

6    slither to get where we are going.  They would be shocked to

7    see Mawozo invade Miami."

8            These conversations show that defendant Tunis is

9    directly communicating with the high leadership of this gang,

10   referring to Coconspirator 1 and, additionally, Individual 1,

11   who I will get to in a minute.

12           For example, toll records from the defendant -- not

13   toll records, but cell data records from Tunis' cellular

14   telephone, with the number ending in 3447, reveals that between

15   August of 2021 and October of 2021, Tunis communicated directly

16   with Coconspirator 1, who is in jail in Haiti, approximately 88

17   times and just in the period between October 2016 and October

18   21 of 2021 20 times.

19           In addition, Tunis communicated directly with the

20   second person, Individual 2, who is also a member of the Mawozo

21   gang and, in fact, took credit for the kidnapping in Haiti via

22   Facebook postings a total of 261 times between that same time

23   period.  On top of that, there are then three-way calls between

24   the defendant, Ms. Tunis, and C1, Coconspirator 1 and

25   Individual No. 2.

1            Also, according to messages that were found on

2    Ms. Tunis' phone which was searched pursuant to a federal

3    search warrant, in combination with the call records, Tunis

4    obtained -- there are messages in which Tunis obtained

5    specifications for weapons and ammunition that Coconspirator 1,

6    the leader of Mawozo, wanted to be sent to Haiti for use by the

7    400 Mawozo.

8            According to messages found on Tunis' phone, in

9    combination with call data records, Tunis purchased or

10   instructed Dor or St. Louis to purchase other weapons and

11   ammunition for the gang, and those ammunitions are described in

12   the complaint.

13           After those ammunitions were purchased, Tunis, Dor and

14   St. Louis shipped or caused the firearms to be shipped, or

15   attempted the same, to Haiti by smuggling the weapons in these

16   barrels that we have been discussing, drums, and which were

17   covered with various household items and whatnot.

18           More information about the barrels is in the

19   complaint, where I believe it was Mr. St. Louis who

20   specifically, at paragraph 40 of the complaint, on October

21   11th, St. Louis sent an audio message to Tunis stating:  "I

22   sent two barrels and I have other firearms inside of it.  They

23   sent the barrels for $400.  The barrels went to Laboule 16."

24           Laboule is a location south of Port-au-Prince.

25           Among the weapons that were purchased, those are

described in the complaint, the Springfield Armory MIA rifle, which was purchased by Dor -- I'm sorry.  Tunis sent Coconspirator 1 a text message saying that "I got the bullets" and then sent Coconspirator 1 a photograph of the Springfield MIA.  According to firearm store and ATF records, Dor purchased a Springfield Armory rifle for $2500 on October 6.  Exactly the same rifle that they were discussing.

There is also a discussion about a Barrett .50 caliber rifle as well.  With reference to that particular weapon, there are audio messages recorded on or about October 6, paragraph 32 of the complaint, between Tunis and Dor, whereas Tunis sent Dor an audio message in Creole discussing the specialized ammunition that was needed for the Barrett rifle, and that discussion is also contained in the complaint.  Again, the evidence are the defendant's voice in an audio message.

In addition, there are two Century Arms rifles and Palmetto Arms pistol, and that is described in paragraphs 35 and 36, where Tunis, on October 6th, sent a message to St. Louis, directing St. Louis to purchase two AK-47s and one AR-15 from Patrick.

On the same day, St. Louis sent to Tunis four photographs of firearms and thereafter purchased, on October 6th, a Century Arms 7.62 caliber VSKA Century Arms 7.62 caliber WASR.  These are photographs 37A, B and C, and a Palmetto Arms PA-15 caliber 5.56.

1    This is important because on October 10th St. Louis
2  then sent to Tunis a photograph of a single receipt from the
3  pawn shop where he purchased these items for $2,855.  A copy of
4  that receipt was found in Tunis' cell phone upon search.
5    As to the Ruger pistol, also on the defendant's phone,
6  are photographs of ammunition labeled 5.7X28.  That is the same
7  type of ammunition that Coconspirator 1 refers to in a
8  conversation which is summarized in the complaint in paragraph
9  41.
10    In addition, Tunis sent pictures of a Ruger to
11  Individual 3, who had the wisdom not to get involved in this
12  scheme.
13    According to ATF records, on October 14th Tunis
14  purchased a Ruger 5.7 serial at the pawn shop in Pompano Beach
15  for an unknown amount.
16    Also on October 14th, defendant Tunis sent
17  Coconspirator 1 a message via What's App stating that "the
18  other gun will come on Tuesday."
19    Tunis signed various ATF Forms 4473.  In signing that
20  form, she clearly made the false statement that she was the
21  ultimate buyer of these firearms.  In particular, paragraph 47
22  lists a number of these forms that were filled out by either
23  Tunis, St. Louis or Dor.
24    But with reference to Tunis, we have one on March 23,
25  2020, one on December 15, 2020, one on March 13, 2021, one on

1   April 17, 2021, and then one on October 11, 2021, and then

2   October 14, 2021.  These false statements were made to the

3   dealers as well as to the ATF regarding the purchase and

4   ultimate use of these weapons.

5          In terms of the shipment, the smuggling counts, we

6   have got three different shipments:  A shipment on October 9, a

7   shipment on October 11th, and a shipment on October 19th.

8          With reference to the October 9th shipment, there are

9   photographs in the cell phones on October 9th regarding various

10  firearms, and that is summarized in paragraph 52A through E.

11  Also, St. Louis sent an audio message via What's App to Tunis

12  stating, "I sent the two barrels.  I have other firearms inside

13  of it.  They sent the barrels for $400.  The barrels went to

14  Laboule."  It is the same paragraph I quoted before.

15         So the evidence includes phone records, the phone

16  calls and What's App messages that were downloaded from the

17  phone, the photographs from the defendant's phone, which we

18  went through during the hearing, defendant's voice statements.

19         What we haven't discussed yet are the defendant's

20  admissions that were made to the FBI.

21         According to the agent, there is a three-page

22  confession.  Among the items in the confession, the defendant

23  admitted that she bought firearms that were going to go to

24  Haiti; she admitted that she bought ammunition that went to

25  Haiti; she admitted sending both firearms and ammunition to

1   Haiti; she admitted that she was involved with St. Louis and

2   Dor to buy and send the guns to Haiti; she admitted going to

3   the Lucky Pawn shop to make these purchases, some of these

4   purchases; she admitted receiving money from Haiti to buy

5   weapons and ammunition; she admitted working with individuals

6   in Haiti and getting the money from Haiti to buy these weapons.

7   Most importantly, she admitted that she was involved with the

8   400 Mawozo.

9           She is not charged with kidnapping.  She is not

10  charged with anything other than buying and exporting illegally

11  these weapons to Haiti, and the evidence is very clear as to

12  that, that there is probable cause that the crimes were

13  committed.

14          Against this mountain of evidence and given the nature

15  of the crime and the criminal nature of the individuals with

16  whom she appears to be connected or associated with in Haiti, I

17  find that the government has definitely met its burden of

18  showing that the defendant is a danger to the community and

19  that no condition or combination of conditions will reasonably

20  assure the safety of others.

21          In terms of ties, I do note that she is a mother of

22  young children and does seem to have ties in South Florida, but

23  my ruling is really based on the dangerousness to the

24  community.  So I find that the government has met its burden as

25  to danger.  I am not even going to reach whether or not she

1    poses a risk of flight.  That is something that I don't need to

2    get to.

3            I do note that she does face a substantial term of

4    incarceration.  As I noted before, it is 20 years on the ECRA

5    violation, ten years on the smuggling violation, and another

6    five years on the conspiracy count.  She does have substantial

7    ties here in terms of her family and homeownership, but she

8    also has substantial ties to Haiti.  So at best, it might be a

9    wash.

10           Accordingly, I find that the defendant should be

11   detained pending trial.  I also find that there is probable

12   cause for the charges contained in the complaint affidavit.  I

13   know that Mr. Eiglarsh has made an argument regarding the

14   weight of the evidence and that that is appropriate, but not at

15   this hearing.  I think that is something that he is certainly

16   going to bring out during trial and in various motions in

17   advance of trial.

18           Accordingly, based on my probable cause finding at

19   this hearing and the fact that identity has not been contested,

20   I order that the defendant -- give me one second -- I will

21   enter an order of commitment to another district.

22           Just give me one second.

23           (Pause)

24           THE COURT:  Right.  I will enter the commitment order

25   once I complete my detention order; otherwise, I won't have

1    jurisdiction to do so.  So I will enter my order first and then

2    sign the commitment order.

3           Any questions, Mr. Eiglarsh?  I know that you did a

4    very good argument on behalf of your client, but as far as I'm

5    concerned, I have made my decision.

6           Anything else that you want to put on the record?

7           MR. EIGLARSH:  I did want to say on behalf of the

8    family, obviously they were disappointed and that we disagree

9    and/or object to the court's ruling.  In this disappointed

10   state, I would be remiss if I didn't bring up just one thing

11   about your courtroom deputy, Ms. Tamisha Shotwell.  I just

12   wanted to thank her for her professionalism.  Not only did she

13   email us about when we would be heard, but she also called.  I

14   was just very grateful, very much, for her professionalism.  I

15   just wanted to say that.

16          THE COURT:  That is really wonderful of you to say and

17   I appreciate it.  I so wholeheartedly agree with your

18   assessment of Ms. Shotwell.  Thank you for saying that.

19          MR. EIGLARSH:  But I'm still disappointed with the

20   court's ruling.

21          THE COURT:  I understand.

22          Ms. Koontz, anything else from the government?

23          MS. KOONTZ:  No, your Honor.

24          THE COURT:  All right.  Ms. Koontz, my practice, as

25   you know, is to ask the government to submit a detention order,

```
 1   a draft detention order to my chambers within 24 hours.  So

 2   given that today is Friday -- I think it is Friday.  I have

 3   lost all track of time.  It's been a crazy week.  I will have

 4   that on Monday, please.

 5          MS. KOONTZ:  Yes, your Honor.

 6          THE COURT:  All right.  Thank you.

 7          Ms. Tunis, I know that you are disappointed as well,

 8   but I do wish you luck and you have a very good lawyer to help

 9   you.

10          Have a good day.

11          (Adjourned)

12

13                    C E R T I F I C A T E

14

15       I hereby certify that the foregoing is an accurate

16   transcription to the best of my ability of the digital audio

17   recording in the above-entitled matter.

18

19   November 10, 2021        s/ Joanne Mancari
                              Joanne Mancari, RPR, CRR, CSR
20                            Court Reporter
                              jemancari@gmail.com
21

22

23

24

25
```